# EXHIBIT A

| Civil Action Cover Sheet - Case Initiation | (12/01/24) CCL 0520 |
|---|---|

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

VANESSA SMITH

v.

Wyndham Hotels, Inc, By the Sea Resorts, LLC, and La Quinta Inns Inc

No.

2026L000045
Judge: Calendar, [

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☒ Yes ☐ No

**FILED**
JAN 05 2026
MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

(FILE STAMP)

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

### COMMERCIAL LITIGATION
CASE TYPES:
- ☒ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

**

Primary Email: gc.3@yahoo.com

Secondary Email: _____

Tertiary Email: _____

By: Vanessa Smith, Pro Se

(Attorney)          (Pro Se)

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Oice Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____



**Complaint**

(12/01/24) CCL 0063 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, LAW DIVISION

VANESSA SMITH
_____
_____
                                    Plaintiff(s)

v.

WYNDHAM, BY THE SEA RESORTS, LAQUINTA
_____
                                    Defendant(s)

Case No. _____ 2026L000045
                   Judge: Calendar, I

Contract: Breach of Contract, Negligence et al

Amount Claimed: $200,000.00

Return Date: _____

### COMPLAINT

The Plaintiff(s) claim(s) as follows (use next page if more space is required.):

See Attached Verified Complaint, and Certificate of Service and attached exhibit.

The allegations in this complaint are true.

○ Atty. No.: _____   ◉ Pro Se 99500

Atty Name: Vanessa Smith                          Dated: 1/2/26

Atty. for (if applicable): _____

Address: 1811 Hanover Lane

City: Flossmoor                 State: IL          _____
                                                              Signature
Zip: 60422

Telephone: 773-386-0148

Primary Email: gc.3@yahoo.com

**Mariyana T. Spyropoulos,, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 2



F I L E D
JAN 05 2026
MARIYANA T. SPYROPOULOS
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

VANESSA SMITH,
    Plaintiff,

    v.

WYNDHAM HOTELS and RESORTS, INC.,
BY THE SEA RESORTS, INC. d/b/a
LAQUINTA INN AND SUITES, INC. and
LAQUINTA INN AND SUITES, INC.,
    Defendants.

Case No.: 2026L000045
Judge: Calendar, I

**Jury Trial Demanded**

## COMPLAINT FOR BREACH OF CONTRACT, NEGLIGENCE, VIOLATION OF ILLINOIS CONSUMER FRAUD ACT, VICARIOUS LIABILITY AND PUNITIVE DAMAGES

1. Plaintiff, Vanessa Smith, files this Complaint for Breach of Contract,

Negligence, Unjust Enrichment, Consumer Fraud, Vicarious Liability and Punitive

damages by Wyndham Hotels and Resorts, Inc. (Wyndham), By the Sea Resorts, LLC,

1

(Sea Resorts) and LaQuinta Inn and Suites, Inc., (LaQuinta or Hotel), and in support thereof alleges as follows:

## INTRODUCTION

2.  This lawsuit is a "bed bug" case against the Defendants to compensate the Plaintiff for her losses, pain and suffering. This lawsuit seeks the enforcement of the Terms and Conditions Agreement between the Plaintiff and the Exchange Credit Program. The claims against Wyndham, Sea Resorts and LaQuinta are because the they failed to provide hotel services as promised in exchange for payment. The Plaintiff used her Exchange Credit Program, Military Star Card (Star Card) credit card to book and pay for her hotel services with Wyndham, Sea Resorts and LaQuinta on the internet while she was at home in Chicago, Illinois. Wyndham, Sea Resorts and LaQuinta were negligent and fraudulent towards the Plaintiff, whereby she suffered harm and damages.

## CONCISE STATEMENT OF THE CASE

3.  Defendants Wyndham, Sea Resorts and LaQuinta, they were grossly negligent and negligent towards the defendant. The Plaintiff sustained damages and injuries, bed bug bites and related injuries, during her stay in her LaQuinta hotel room 325 and room 225 at the LaQuinta Inn and Suites located at 17710 West Panama City Beach Parkway, Panama City, Florida 32413, Aril 23-28, 2025.

4.  This case involves the willful and wanton, negligent and fraudulent conduct by Wyndham, Sea Resorts and LaQuinta in total disregard of the health and safety of Plaintiff, Vanessa Smith.

5.  The hotel defendants, Wyndham, Sea Resorts and LaQuinta, repeatedly rented rooms to unaware and trusting citizens and veterans when it knew, at all times,

2

that those rooms were crawling with bed bugs that feed exclusively on human and animal blood. Rooms that had been marked as a danger to guests and do not rent.

6. The physical, emotional and mental injuries and monetary damages caused by Defendants actions, a result of their total disregard for the health and safety of their customers and the Plaintiff and their inexorable obsession with the bottom-line of money, mandates the imposition of punitive damages to punish the defendants for its conduct and to deter these types of business practices in the future.

## THE PARTIES

### Plaintiff

7. Plaintiff, Vanessa Smith, resided in Chicago, Cook County, Illinois. Plaintiff is a citizen and resident of Cook County, Illinois. Plaintiff is the consumer and entered into a contract with the Defendants for hotel services. Plaintiff complied with all terms of the hotel services contract with the Defendant.

### Defendant Wyndham Hotels and Resorts, LLC (Wyndham)

8. Defendant Wyndham Hotels and Resorts, Inc., d/b/a LaQuinta Inns and Suites, principal place of business is at 22 Sylvan Way, PARSIPPANY, NJ 07054. Wyndam is a resident and citizen of New Jersey. Wyndham Corporation is registered with the Illinois Secretary of State, and the registered agent is Corporation Creations Network, Inc., 1320 Tower Road, Schaumburg, Illinois 60173. Wyndham is the parent company of LaQuinta Inn and Suites and franchisor for By The Sea Resorts, Inc. The confirmation of payment, reservation and itinerary document sent to the Plaintiff listed LaQuinta Inn and Suites by Wyndham Panama City Beach, address 17710 Panama

3

City Beach Parkway, Panama City Beach, Florida, 32413. Confirmation number is 855661106.

9. Wyndham Hotels and Resorts, Inc. ("Wyndham") is a New Jersey For-Profit Corporation headquartered in Parsippany, New Jersey. Their NJ File No. is 101049056.

10. Publicly held Wyndham is the world's largest hotel franchising company by number of hotels. It operates a portfolio of 24 hotel brands, with approximately 9,200 hotels containing about 872,000 rooms located in over 95 countries, United States, including Illinois. On information and belief, Wyndham is the franchisor to By the Sea Resorts, Inc., the franchisee.

11. At all times material to this Complaint, Wyndham has been in the hospitality business, franchising and managing hotels throughout the United States. Wyndham transacts or has transacted business in this district and throughout the United States. At all relevant times, it has controlled the acts and practices of its subsidiaries described below and approved of or benefitted from such subsidiaries' acts and practices at issue in this Complaint.

12. Throughout the relevant time period, Wyndham has licensed the Wyndham name and business structure and support to hotels through franchise agreements, and provided various services to those hotels. Wyndham transacts or has transacted business in this district and throughout the United States.

13. Wyndham has operated as a common business enterprise while engaging in the unfair and deceptive acts and practices alleged in this Complaint.

14. Wyndham has conducted its business practices described below through an interrelated network of companies that have common ownership, business functions,

4

employees, and office locations. Because these Defendants have operated as a common enterprise, they are jointly and severally liable for the unfair and deceptive acts and practices alleged below.

15. Under their franchise and management agreements, Hotels and Resorts require each Wyndham-branded hotel to purchase, and configure to their specifications, a designated computer system, known as a property management system, that handles reservations, checks guests in and out, assigns rooms, manages room inventory, and handles payment card transactions. These property management systems store personal information about consumers, including names, addresses, email addresses, telephone numbers, payment card account numbers, expiration dates, and security codes hereinafter personal information.

16. Each Wyndham-branded hotel's property management system is managed by Defendants. Only Defendants, and not the owners of the Wyndham branded hotels, have administrator access that allows Wyndham to control the property management systems at the hotels. Wyndham set the rules, including all password requirements, that allow the Wyndham-branded hotels' employees to access their property management systems.

17. Wyndham, either itself or by and through a third party, accepts reservations for its hotel online through one or more websites. The purpose of these websites is so that members of the public may reserve guest accommodations and review information pertaining to the goods, services, features, facilities, benefits, advantages, and accommodations of the Property.

5

18. Wyndham provides instant credibility, marketing power ad operational support and is considered as a "business partner." Wyndham provides a loyalty program, brand marketing and sales, global distribution, negotiated supplier savings and cutting-edge technology platforms, designed to make hotel operations easier and more profitable.

19. Wyndham provides a field operation team to provide hands-on guidance to hotels. Wyndham University provides tailored training and education to strengthen hotel operations in areas such as property operations, marketing, revenue generation and guest experience.

20. Wyndham provides expert architecture, design and construction project management to hotels. Their franchise agreements are for twenty (20) years.

### By The Sea Resorts, Inc. (Sea Resorts)

21. By The Sea Resorts, Inc., (Sea Resorts) main address is 17710 Panama City Beach Parkway, Panama City Beach, Florida 32413. The Florida License mailing address is P O Box 18829, Panama City Beach, Florida 32413, County of Bay. The License location is 17710 Panama City Beach Parkway, Panama City Beach, Florida 32413. The Florida registered agent is Michael Burke, Sesq, 16215 Panama City Beach Parkway, Panama City Beach, Florida 32413. By The Sea Resorts, Inc., is a resident and citizen of Bay County, Florida.

22. By The Sea Resorts, Inc. does business as LaQuinta Inn and Suites, located at 17710 Panama City Beach Parkway, Panama City Beach, Florida 32413. This is the location of the LaQuinta Inn and Suites where hotel services were to be provided to the Plaintiff.

6

## LaQuinta Inn and Suites, Inc. by Wyndham (Hotel)

23. Defendant LaQuinta Inn and Suites, Inc. by Wyndham (LaQuinta or hotel), is a franchisee/subsidiary of Wyndham, and its principal place of business is located at 22 Sylvan Way, Parsippany, NJ 07054. The LaQuinta where the Plaintiff's hotel services were supposed to be provided was located at 17710 W Panama City Beach Parkway, Panama City, Florida 32413. LaQuinta is a resident and citizen of Bay County, Florida. LaQuinta operates hotels throughout the United States, including Illinois. LaQuinta operates at least ten (10) hotels in Illinois.

## JURISDICTION AND VENUE

24. This Court has jurisdiction of this action pursuant to in that the location of the substantial acts occurred in Cook County, Illinois. The amount in controversy of this matter exceeds the amount of $75,000.00, exclusive of interest and cost.

25. The Plaintiff is a resident and citizen of the State of Illinois. Defendants actively operated a booking and hotel services business in Illinois. Defendants Wyndham, Sea Resorts and LaQuinta actively advertised and contractually conducted business in Illinois. They book, reserve, accept payments, and confirm hotel reservations in Illinois. The contract between the parties was made in Illinois and Payment was made and received in Illinois. Medical Treatment was provided in Illinois. Therefore, jurisdiction and venue are proper in this Court.

## FACTURAL ALLEGATIONS COMMON TO ALL COUNTS

### Hotel Booking and Payment Agreement for Wyndham, By The Sea Resorts and LaQuinta

26. Plaintiff hereby incorporates each of the allegations in the preceding paragraphs as if fully set forth herein.

7

27.  In Chicago, Illinois, Plaintiff read the advertisement and hotel information on the internet.  On the internet site, operated by Defendants Wyndham, Sea Resorts and LaQuinta in Illinois, the Plaintiff booked and paid in full for hotel accommodations at LaQuinta Inn and Suites in Panama City, Florida, for dates April 23-37, 2025.

### April 23, 2025, Wednesday, Plaintiff's Hotel Check In to LaQuinta, Room 325

28.  On April 23, 3035, the Plaintiff arrived at the hotel around the time of 12:00pm.  The Plaintiff checked in at the front desk of the hotel and presented a different credit card to pay for any incidentals.  The Plaintiff signed completed the guest check in form and signed her name and initials.

29.  At check in the, the front desk employee informed the Plaintiff that the hotel was "completely booked" that weekend.  The front desk employee and the Plaintiff had a conversation concerning the proper check in time.  The Plaintiff had requested a room on the first floor.  Due to all rooms being occupied, the Plaintiff was not able to get a room on the first floor.

30.  Check in time at the LaQuinta was at approximately 4:00 pm.  So, after the Plaintiff did the check in paperwork, she left the hotel until check in time at 4:00pm to get something to eat across the street from the hotel.

31.  At approximately 4-5:00pm, the Plaintiff returned to the LaQuinta.  She was given the room card for room 325, and the room card cover to hold the room card key.

32.  When the Plaintiff came back to the hotel, the manager was present at the check in.  At all relevant times, the Plaintiff spoke to the manager, the maintenance supervisor and the front desk employee.  Their names were Kandus, Bobby, and Toni.

33.  Based upon information and belief, Kandus, Bobby and Toni were the manager, maintenance person and front desk clerk for Defendants Wyndham, Sea Resort and LaQuinta and were in control and possession of the aforementioned premises, and responsible for, among other things, performing, overseeing and/or coordinating the stay and safety of Defendants' guests.

34.  Based upon information and belief, Kandus, Bobby and Toni, LaQuinta employees, were acting within the scope of their employment for Sea Resort and LaQuinta.

35.  The manager, a female, verbally and personally informed the Plaintiff that the hotel was "lovely" and that people "like it here." Plaintiff asked the manager where the elevator was located.  The Plaintiff then personally carried her luggage to room 325 after receiving the key card.  A day later, this manager would be the same person who would give the Plaintiff a different room, room 225, after Plaintiff complained of bed bug bites in room 325.

36.  This manager would be the same person to whom the Plaintiff showed her bed bug bites on her arm, chest, neck and face jaw area while in the hotel lobby.

37.  This manager would be the same manager to whom the Plaintiff requested that she accompany the Plaintiff to room 325 to see the evidence of bed bugs.  The manager refused to go the room 325 to see the evidence of the bed bugs.

38.  When the Plaintiff arrived in the room 325, she immediately noticed that the room felt like a "spa hot steam room" on her skin and that the AC unit was not on.

39.  When she touched the bedding, which included the bedding cover, sheet and pillow cases, it felt wet/moist and damp.  She noticed that the room had a small

9

loveseat. The loveseat had a foul smell and contained a lot of stains all over it. The Plaintiff tried to operate the AC unit, but nothing worked. The Plaintiff took a shower. However, the water did not drain down the tub and instead it formed full like taking a bath. Plaintiff noticed that the bedding, and towels had a damp feel to her skin.

40. Due to being so tired from the nonstop airflight from Chicago, and getting up at 4:00am to catch the flight, the Plaintiff laid down to go to sleep on the bed in the room.

**April 24, 2025, Thursday, Plaintiff's Second Night LaQuinta Stay, Room 325**

41. During the night, the Plaintiff noticed that she was feeling itchy, and scratching vigorously on her neck and chest. She was scratching so hard, welts began to form. Later in the day, papules began to form on her arms, shoulder, chest, neck and jaw area. The Plaintiff tried to operate the AC unit thermostat; it would not turn on in the room. The Plaintiff saw that there was still shower water in the tub.

42. The Plaintiff got dressed, and left the hotel to attend the event on time. While at the event, at approximately 9:00am, on April 24, 2025, Thursday, the Plaintiff telephoned the LaQuinta front desk to report the problems. During this time, the Plaintiff was still itchy and scratching her body, which was red, and painful to the touch. The Plaintiff was feeling weakness and had a headache.

43. The Plaintiff reported to the front desk the following problems: AC unit/thermostat not working, the wet/damp bedding and towels, foul smell and or pet smell, the permanently stained and nasty looking loveseat, the bath tub not draining the water and that "something was not right with the room."

10

44.  Plaintiff requested to the LaQuinta front desk person that hopefully the problems could be remedied before she returned to the room at the end of the day.  The Plaintiff was at the event all day, and into the evening until approximately 9:00pm.

45.  When the Plaintiff returned to the LaQuinta room 325 Thursday night at approximately 9:00pm, she saw that no repairs had been made to the room. At this time, the Plaintiff's scratching got tremendously worse.  She was still itching and scratching her arms, shoulder, chest, neck and jaw area.  The areas had welts, swelling and redness and sore to the touch.

46.  While out during the day, Plaintiff noticed that her skin was now inflamed, red, itchy, and sore.  She continued to have the headache, and body pain.  On the second day, the Plaintiff noticed that the bites had spread on her body, which caused her to itch, scratch, get redness, swelling and welts on more parts of her upper body.

47.  The Plaintiff was unable to sleep the Thursday night in the LaQuinta room. Out of fear of the swelling on her neck, the Plaintiff to a pain reliever and antihistamine. After realizing the seriousness of the what was happening, and the fact that the skin condition made attending the event difficult, complained again to the hotel front desk employee.

48.  On Friday morning, The Plaintiff had numerous bed bug bites on the upper part of her body.  Again, the Plaintiff complained to the front desk staff, based on information and belief, the front desk person was named, "Toni."  Toni stated to the Plaintiff that "maintenance" would check on her problems Thursday night.  When the Plaintiff came back to room 325 and spoke to the front desk clerk, she was told that one had been to her room to correct the problems in the Plaintiff's room 325.

49. Plaintiff repeated the all the problems to Toni at the front desk: the numerous bed bug bites, welts, itching, scratching and allergic reactions, redness, pain, soreness and headaches. Toni informed the Plaintiff that the maintenance person was on the way in to the hotel and would then look into her room, room 325. Plaintiff then left the hotel to attend her event.

50. While at the event, the Plaintiff felt so sickly that she left the event and returned to the hotel. At the hotel, the Plaintiff asked Toni, the front desk clerk, about whether the maintenance person was able to fix the problems in room 325. Toni called the maintenance person to speak to the Plaintiff.

51. Plaintiff informed the maintenance person that she believed that the cause of her itching, scratching, soreness, pain, headaches, swelling and dark spots on her body were due to bed bugs. The maintenance person stepped out of the room and said tell the manager, because his department handles only maintenance problems. He refused to look at the mattress, although the Plaintiff had lifted mattress at the headboard for him to see the bed bugs on the pillow cases, and sheets at the head of the bed. The maintenance person left the room and refused to look at or touch at the bed linen or mattress.

52. The Plaintiff then asked about getting another room because of the bed bugs, broken AC unit, broken thermostat, damp/wet linen, towels and wash cloths, which were never replaced, the standing water in the bathtub, the foul smell, permanent stains in the rug, and loveseat, the pet smell and dog hair.

53. Plaintiff informed Toni that she could not stay in room 325 again. The Plaintiff asked Toni if LaQuinta could provide her with another room in a different

12

LaQuinta hotel. This request was refused and/or denied. During this time, the LaQuinta manager appeared at the front desk.

54. While in the lobby of the hotel, the Plaintiff reported the problems in her room 325 to the manager. The Plaintiff showed the manager her bed bug bites, papules scratches, swelling and redness on her chest, arms, and neck and face. Plaintiff asked the manager to go to room 325 with her so that she could see the problems in the room. The manager adamantly refused to go to the room. Plaintiff heard Toni, the hotel desk clerk, who was standing within hearing distance at the counter, say, "it's happened again" when she heard the Plaintiff describing the bed bug problems in the room 325 to the manager. Plaintiff exclaimed to Toni, "what do you mean "again." Toni then walked away from the front desk to go into the back room.

**April 25, 2025, Friday, Third Night LaQuinta Hotel Stay Changed to Room 225**

55. After the manager refused to go to room 325 to see the problems, the manager offered the Plaintiff a room change to room 225. Plaintiff accepted room 225. The Plaintiff packed up her personal items in room 325. Due to the bed bugs, the Plaintiff put the clothes that had been taken out of the suitcase into a plastic bag so that the bed bug infestation would not affect her clean clothes that had remained in the suitcase. The Plaintiff then hurriedly left room 325 to go to room 225 in the hotel.

56. Meanwhile, the Plaintiff was unable to attend the events for Friday because she was still at the LaQuinta Hotel. The Plaintiff left room 325 and placed her belongings in room 225. However, once the Plaintiff was in room 225, the Plaintiff noticed that she had left her wallet, containing her important travel papers, credit card, and passport in the room 325.

**Plaintiff's Wallet Left in Infested LaQuinta Hotel Room 325,**
**Which was Immediately Rented to New Guests without**
**Cleaning and Preparation in Violation of Industry Standard Practices**

57. For security reasons, the Plaintiff had put her wallet underneath the mattress. The Plaintiff immediately left room 225 to go to the front desk for assistance in getting her wallet. At the front desk, Toni was still there. Plaintiff informed Toni that she had left her wallet, containing her state ID, passport, credit cards, and other important documents in her wallet, which was underneath the mattress. Toni informed the Plaintiff that the room, room 325, had been given to another guest, his wife and children and pet within approximately one (1) after the Plaintiff left the room 325. Toni informed the Plaintiff that she could not go into the room. Plaintiff asked Toni to call the room or the new guests.

58. Toni informed the Plaintiff that the new guest in room 325, was out of the room having breakfast at a restaurant and that upon their return to the hotel, they would check room 325 to see if the wallet was still underneath the mattress on the king bed (there was only 1 bed in the room and a loveseat).

59. Plaintiff told the front desk clerk Toni that she had to wait in the lobby to get her wallet because she would not be able to fly back home to Chicago without those documents and identification. So, the Plaintiff waited in the hotel lobby for approximately two (2) hours.

60. At the end of approximately two (2) hours, the new hotel guest in room 325, came to the Hotel front desk. He stated that my wallet was still under the mattress where the Plaintiff had put it, underneath the same infested bed linen. Although the Plaintiff was overjoyed and relieved to receive her wallet, she realized that the Hotel had

not changed the bed bug infested linen on the bed, and given the same infested room 325 to a new guest, his wife, children and pet.

61. Although, the Plaintiff was put into another room directly below the infested room 325, the same problems existed in room 225.

62. On April 26, 2025, Friday, in hotel room 225, the AC unit was not working, the thermostat did not work, the room felt damp like a spa steam room, the bedding and towels (which included the sheets, cover and pillow cases) and washcloths were damp/wet, the bathtub ring around the tub had not been clean, the rug had permanent stains and smelled foul, pet smells. Plaintiff's bed bug bite symptoms continued so bad that the Plaintiff was taking Benadryl and Motrin to ease the pain, headache, itching, scratching, swelling and soreness. Plaintiff was still unable to sleep. At this point, the Plaintiff began to experience stress, anxiety, and paranoia.

63. On Saturday morning, April 26, 2025, the Plaintiff informed the front desk person and the manager that room 225 had the same problems and that her bed bug bites were worse along with her other symptoms. The manager refused to come to the room to see the bed bugs, broken AC unit, damp/wet bedding.

64. Plaintiff requested to speak with the maintenance person again about the listed problems with the room 325 and 225. He informed the Plaintiff that the AC units were n\new," and due to the warranty conditions, the manufacturer's maintenance people were the only people who could "work on" the AC unit. The maintenance person touched the damp/wet bed linen and saw the standing water in the tub. He stated that the bed bugs were not his department.

65.  Plaintiff began searching for medical treatment in Panama City Beach.  On Sundays, practically all of the urgent care centers were closed or more than an hour away.  The nearest Veteran's Administration hospital was approximately over a 2-hour personal drive.  There was no Lyft or Uber services for the 2-hour drive.

66.  Plaintiff resolved to get medical treatment as soon as she returned home to Chicago, Illinois.

67.  The Plaintiff asked to be moved out of room 225 to somehow resolve this woeful situation.  Toni informed the Plaintiff that the hotel was completely full and that she was unable to move the Plaintiff to another LaQuinta hotel.

68.  Plaintiff informed Toni that "this" was unacceptable.  Plaintiff then took a picture of Toni in the lobby with her cellphone; in case she would run off again to the back room.

69.  On Saturday, April 26, 2025, following the above stated conversation with the LaQuinta manager and front desk clerk, the Plaintiff began to look for suitable hotel services for the remainder of the stay in Panama City Beach for the event she had flown to attend from Chicago, Illinois.

## April 26, 2025, Saturday, Plaintiff Obtained Substitute Hotel Accommodations

70.  Using Priceline again, On Saturday, April 26, 2025, the Plaintiff obtained substitute hotel services at Hampton Inn and Suites, located at 13505 Panama City Beach Parkway, Panama City Beach, Florida, 32407.  The Hampton Inn booking was for check in on Saturday, April 26, 2025 and check out on Monday, April 28, 2025.  The cost of this booking was $389.20 ($159.16/night versus LaQuinta $119.69/night).

71. Plaintiff made the payment and booking with Hampton Inn through using her credit Card.

72. On April 26, 2025, the Plaintiff physically checked into Hampton Inn, and checked out on Monday, April 28. 2025.

73. Plaintiff was completely unaware of the previous bed bug infestations at the LaQuinta Hotel.

74. LaQuinta, through its agents and employees continued to lease rooms to unsuspecting guests that had bed bug infestation.

### Wyndham, Sea Resorts and LaQuinta Were Aware of
### Bed Bug Infestation By Internet Reviews and Their Responses

75. Defendants Wyndham and LaQuinta were are of the bed bug infestation for the past several years.

76. branded hotels, have administrator access that allows Defendants to control the property management systems at the hotels. Defendants set the rules, including all password requirements, that allow the Wyndham-branded hotels' employees to access their property management systems.

77. On or about October 1, 2000, an unidentified hotel guest discovered bed bugs and or ticks in room 1019 at or about 2:17am. They complained to LaQuinta and were transferred to another room

78. Despite knowing that room 1016 had an bed bug infestation, LaQuinta placed another unsuspecting guest in that room on October 1, 2029. At no time did LaQuinta inform these guests of the bed bug infestation in the room it booked them into stay.

17

79. Two days later, On October 3, 2001, room 1016 was placed on "do not rent, bugs in room" status for 7 days.

80. None of these rooms were treated by any exterminator, bed bug infestations inside them were allowed to multipin and eggs and larvae deposited.

81. On information and belief, LaQuinta made no mention to the guests of the bed bug infestation.

82. In fact, prior to sometime February 07, 2020, Defendants had actual and constructive notice of the Subject property and Hotel Rooms including but not limited to the room 102, and 109 were contaminated with bed but infestation, as numerous prior hotel guest have written reviews about Subject Property and Hotel Rooms contaminated with bed bugs infestation over years, through Google review platform, Yelp review platform, and Booking.com review platform.

83. Defendant failed to disclose the material facts or warn Plaintiffs of the presence of these filthy infestations at the Subject Property and Hotel Room prior February 07, 2020.33. Due to Defendants' failure to remedy the bed bug infestation, Plaintiffs were exposed to painful and disgusting bed bug infestations, and as a result, suffered physical injuries, emotional distress and mental anguish and presently ongoing emotional distress and mental anguish. Plaintiffs are informed and believes that Defendants were aware of bed bug complaints prior to Plaintiffs' arrival at the Premises

**Defendants Were Aware of the Bed Bug Infestation and Other Hotel Violations**

84. The Defendants are required to use reasonable care to warn of, safeguard against or remedy an unreasonably dangerous condition of which it had notice. Notice of the unreasonably dangerous condition is satisfied by any of the following: (a) The

Defendants or its employees created the condition; (b) The Defendants or its employees actually knew of the condition in time to provide a remedy or warning; or (c) the condition existed for a sufficient length of time that The Defendants or its employees, in the exercise of reasonable care, should have known of it.

85. Wyndham, Sea Resorts and LaQuinta breached that duty when it, among other things, allowed an infestation of Cimex Lectularius (a bed bug known to carry disease, bite and suck blood from people while they sleep) to become established in room 325 and 225 of the LaQuinta Inn and Suites and still rented the Room to the Plaintiff and subsequent guests in room 325, which consisted of a man, his wife, children and pet dog.

86. As a direct and proximate result thereof, the Plaintiff suffered damages which include, but are not limited to, the following:

A. The physical injury she sustained when she became a bed bug food source, while she slept in rooms 325 and 225; and

B. The psychological injury she sustained when she awoke and discovered bed bugs in her bed, in the pillows and sheets, and learned that she became a food source, while she slept, for the other occupant of room 325 225, Cimex Lectularius.

## Rooms Were Rented to the Plaintiff and Unsuspecting Guests Without Being Treated in Violation of Florida Department of Business and Professional Regulation

87. The Division of Hotels and Restaurants is responsible for regulating public lodging establishments in Florida.

19

88.  Heating and ventilation must be kept in good repair or installed to maintain a minimum of 68 degrees Fahrenheit throughout the building.

### Applicable Hotel Industry Standards
### Florida Premises Liability

89.  Also, because the state legislature has determined that it is important to safeguard the health, safety, and welfare of those using our public lodging establishments relating to certain issues, the legislature has enacted the following statutory laws to protect hotel guests:  Florida Statute 509.211 – which relates to safety regulations for matters which include locks on doors and railings on balconies and stairways;  Florida Statute 509.215– which relates to fire safety and fire sprinkler systems; and  Florida Statute 509.221 – which relates to sanitary regulations, including showers, toilets, lighting, and cooling and heating systems.

90.  In Florida, a guest enters into a binding contract to pay for lodging at a hotel and the hotel undertakes legal duties distinct from that contract to provide safety to that guest during their stay. This is the hotel's duty of reasonable care.

91.  The bottom line here, if a guest is injured during a stay at a Florida hotel, or while visiting the premises, and he or she is in a location where guests are normally found or permitted, then the guest can get an amount of compensation that makes him or her whole again. Determining that amount of compensation is based upon Florida statutes and Florida case law (common law created by court decisions) and the skills of your hotel negligence lawyer.

92.  Florida hotel facilities must conform to the requirements of the Americans with Disabilities Act (ADA).

20

93. Florida law is cognizant of the importance of the hospitality industry (which forms a significant part of the state's economy) and the unique service it provides customers. Hotel guests trust these businesses to provide a safe, comfortable place to stay and keep their belongings. Hotels are responsible for making sure their guests are safe while on the premises. However, accidents do occur, and sometimes hotel guests or visitors get hurt. Under Florida law, hotels and motels owe their guests a duty of care and are required to meet certain operating standards. If they breach this duty of care, they may be held liable for damages that happen due to their failure to operate within those standards.

94. The Florida Legislature passed a set of laws to help ensure that hotels meet certain standards to protect their invitees while operating; hotels are defined as "public lodging establishments" under Chapter 509 of the Florida Statutes. Hotels are legally required to protect against people getting injured in slip and fall accidents, having accidents due to site hazards, and from criminal acts like rape, robbery, or assault. Sadly, sometimes hotels may cut corners to save money, and this can result in accidents and injuries.

95. It is the duty of each operator of a transient establishment to maintain at all times a register, signed by or for guests who occupy rental units within the establishment, showing the dates upon which the rental units were occupied by such guests and the rates charged for their occupancy. This register shall be maintained in chronological order and available for inspection by the division at any time. Operators need not make available registers which are more than 2 years old.

96. 509.111   Liability for property of guests

21

(2)    The operator of a public lodging establishment is not liable or responsible to any guest for the loss of wearing apparel, goods, or other property, except as provided in subsection (1), unless such loss occurred as the proximate result of fault or negligence of such operator, and, in case of fault or negligence, the operator is not liable for a greater sum than $500, unless the guest, prior to the loss or damage, files with the operator an inventory of the guest's effects and the value thereof and the operator is given the opportunity to inspect such effects and check them against such inventory. The operator of a public lodging establishment is not liable or responsible to any guest for the loss of effects listed in such inventory in a total amount exceeding $1,000.

97. <u>509.221   Sanitary regulations</u>

(3)    Each establishment licensed under this chapter shall be properly lighted, heated, cooled, and ventilated and shall be operated with strict regard to the health, comfort, and safety of the guests. Such proper lighting shall be construed to apply to both daylight and artificial illumination.

509.221(3) FS: Each establishment licensed under this chapter shall be properly heated and shall be operated with strict regard to the health, comfort, and safety of the guests.

13-04-4 Mold on wall/ceiling. Mold-like substance on wall/ceiling. 61C-1.004(5) FAC: All building structural components, attachments and fixtures shall be kept in good repair.

15-07-5 Transient - shower/tub soiled. Shower enclosure/tub is soiled. 61C-1.004(2)(a) FAC: Bathroom facilities shall be kept clean, in good repair and free from objectionable odors. [Exemption--61C1.004(2)(e) FAC Nontransient establishments, vacation rentals, and timeshare projects are exempt from the provisions of this subsection.

15-22-5 Transient - objectionable odor in bathroom Objectionable odor in the bathroom. 61C-1.004(2)(a) FAC: Bathroom facilities shall be kept clean, in good repair and free from objectionable odors. [Exemption--61C1.004(2)(e) FAC Nontransient establishments, vacation rentals, and timeshare projects are exempt from the provisions of this subsection.

15-36-5 Shower/tub in disrepair. Shower enclosure/tub in disrepair. 61C-1.004(2)(a) and (5) FAC: (2)(a) Bathroom facilities shall be kept clean, in good repair and free from objectionable odors. [Exemption--61C-1.004(2)(e) FAC Nontransient establishments, vacation rentals, and timeshare projects are exempt from the provisions of this subsection.] (5) All building structural components, attachments and fixtures shall be kept in good repair.

17-01-5 Worn/torn sheets. Sheet(s) on the bed are threadbare/worn/torn. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-03-5 Soiled/stained pillowcase/pillow. Pillowcase/pillow for the bed is soiled/stained. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).]

17-04-5 Sheets not laundered between guests. Sheets and pillowcase(s) not laundered between guests. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-05-5 Towels not changed between guests. Towels not changed between guests. 509.221(5) FS: Each transient public lodging establishment shall furnish each guest with two clean individual towels so that two guests will not be required to use the same towel unless it has first been laundered. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-06-5 Towels soiled. Towel(s) in the guest bathroom soiled. 509.221(5) FS: Each transient public lodging establishment shall furnish each guest with two clean

individual towels so that two guests will not be required to use the same towel unless it has first been laundered. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-07-5 Soiled/stained mattress/box spring. Mattress/box spring of the bed is soiled/stained. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-08-5 Rollaway mattress dusty/soiled. Rollaway bed mattress is dusty/soiled/stained. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

17-09-5 Soiled/stained mattress pad. Mattress pad on the bed is soiled/stained. 509.221(6) FS: Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use. [EXEMPTION -- 509.221(9) FS Subsections (2), (5), and (6) do not apply to any facility or unit classified as a vacation rental, nontransient apartment, or timeshare project as described in s. 509.242(1)(c), (d), and (g).

20-01-4 No ventilation room/apt. No means of ventilation provided. 509.221(3) FS: Each establishment licensed under this chapter shall be properly ventilated and shall be operated with strict regard to the health, comfort, and safety of the guests.

20-02-4 Bedroom not ventilated. No form of ventilation provided in the bedroom. 509.221(4) FS: Each bedroom in a public lodging establishment shall have an opening to the outside of the building, air shafts, or courts sufficient to provide adequate ventilation. Where ventilation is provided mechanically, the system shall be capable of providing at least two air changes per hour in all areas served. Where ventilation is provided by windows, each room shall have at least one window opening directly to the outside.

20-03-4 Gaseous odor. Gaseous odor inside establishment. 509.221(3) FS: Each establishment licensed under this chapter shall be properly ventilated and shall be operated with strict regard to the health, comfort, and safety of the guests.

20-05-4 Ventilation system/AC not maintained. The ventilation system/air conditioner is not functioning/in disrepair. 61C-1.004(10) FAC: The heating and ventilation system shall be kept in good repair.

20-07-4 AC not clean/moldy. Air conditioning unit has an accumulation of a mold-like substance. 61C-1.004(5) FAC: All building structural components, attachments and fixtures shall be kept in good repair, clean and free of obstructions.

20-08-4 Inadequate ventilation (mold growth/odor). Inadequate ventilation provided. Mold-like growth/odor present. 509.221(3) FS: Each establishment licensed under this chapter shall be properly ventilated and shall be operated with strict regard to the health, comfort, and safety of the guests.

24-01-4 Live vermin. Live vermin present. 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated. High Priority.

24-03-4 Operator failed to take effective measures. Operator not taking effective measures to prevent the entrance and breeding of pests and/or to eliminate pests. 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated. High Priority.

24-15-4 Vermin droppings/eggs. Vermin droppings/eggs present. 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated. High Priority.

24-22-4 Live bed bugs. Live bed bugs present. Do not rent or use these room(s) until a callback inspection is conducted and no bed bugs are found. The use of a professional trained in the detection and treatment of bed bugs is recommended. 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such an establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated. High Priority.

24-23-4 Dead bed bugs. Dead bed bugs present. Do not rent or use these room(s) until a callback inspection is conducted and no bed bugs are found. The use of a professional trained in the detection and treatment of bed bugs is recommended. 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such an establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated. High Priority.

24-24-4 Evidence of bed bugs. Bed bug activity present as evidenced by shed skins, egg casings, excrement and/or blood marks. Do not rent or use these room(s) until a callback inspection is conducted and no bed bugs are found. The use of a professional trained in the detection and tre 509.221(7) FS: The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such an establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated.

29-02-4 Loss of guest property operator's fault. Operator at fault/negligent in the loss of a guest's property. 509.111(2) FS: The operator of a public lodging establishment is not liable or responsible to any guest for the loss of wearing apparel, goods, or other property, except as provided in subsection (1), unless such loss occurred as the proximate result of fault or negligence of such operator, and, in case of fault or negligence, the operator is not liable for a greater sum than $500, unless the guest, prior to the loss or damage, files with the operator an inventory of the guest's effects and the value thereof and the operator is given the opportunity to inspect such effects and check them against such inventory. The operator of a public lodging establishment is not liable or responsible to any guest for the loss of effects listed in such inventory in a total amount exceeding $1,000.

33-11-4 Overbooking - no effort to find comparable accommodations. The operator failed to make every effort to find comparable accommodations for a guest that had a prepaid reservation and was deprived accommodations. 61C-3.002 FAC: The division shall consider it an unethical business practice for any establishment to engage in, or knowingly permit anyone on the licensed premises to engage in, any illegal, unfair or deceptive act. Such acts include depriving an individual or party of accommodations

at a public lodging establishment after having prepaid reservations for said accommodations. To avoid depriving a guest of a prepaid reservation for accommodations at a public lodging establishment the establishment shall make every effort to find other comparable accommodations; and refund all monies deposited for such reservation whether deposited with the public lodging establishment, or a travel or booking agent.

37-01-4 No guest register. No guest register kept by the establishment. 509.101(2) FS: It is the duty of each operator of a transient establishment to maintain at all times a register, signed by or for guests who occupy rental units within the establishment, showing the dates upon which the rental units were occupied by such guests and the rates charged for their occupancy. This register shall be maintained in chronological order and available for inspection by the division at any time. Operators need not make available registers which are more than 2 years old.

37-03-4 Date occupied not in register. The date(s) the room was occupied is not on the guest register. 509.101(2) FS: It is the duty of each operator of a transient establishment to maintain at all times a register, signed by or for guests who occupy rental units within the establishment, showing the dates upon which the rental units were occupied by such guests and the rates charged for their occupancy. This register shall be maintained in chronological order and available for inspection by the division at any time. Operators need not make available registers which are more than 2 years old.

37-05-4 Room number not on register. The room number is not on the guest register. 509.101(2) FS: It is the duty of each operator of a transient establishment to maintain at all times a register, signed by or for guests who occupy rental units within the establishment, showing the dates upon which the rental units were occupied by such guests and the rates charged for their occupancy. This register shall be maintained in chronological order and available for inspection by the division at any time. Operators need not make available registers which are more than 2 years old.

(4)   Each bedroom in a public lodging establishment shall have an opening to the outside of the building, air shafts, or courts sufficient to provide adequate ventilation. Where ventilation is provided mechanically, the system shall be capable of providing at least two air changes per hour in all areas served. Where ventilation is provided by windows, each room shall have at least one window opening directly to the outside.

(5)   Each transient public lodging establishment shall provide in the main public bathroom soap and clean towels or other approved hand-drying devices and each public lodging establishment shall furnish each guest with two clean individual towels so that two guests will not be required to use the same towel unless it has first been laundered. Each public food service establishment shall provide in the employee bathroom and any public bathroom soap and clean towels or other approved hand-drying devices.

27

(6)    Each transient establishment shall provide each bed, bunk, cot, or other sleeping place for the use of guests with clean pillowslips and under and top sheets. Sheets and pillowslips shall be laundered before they are used by another guest, a clean set being furnished each succeeding guest. All bedding, including mattresses, quilts, blankets, pillows, sheets, and comforters, shall be thoroughly aired, disinfected, and kept clean. Bedding, including mattresses, quilts, blankets, pillows, sheets, or comforters, may not be used if they are worn out or unfit for further use.

(7)    The operator of any establishment licensed under this chapter shall take effective measures to protect the establishment against the entrance and the breeding on the premises of all vermin. Any room in such establishment infested with such vermin shall be fumigated, disinfected, renovated, or other corrective action taken until the vermin are exterminated.

509.233 5.    Dogs shall not be allowed on chairs, tables, or other furnishings.
(d)    A permit issued pursuant to this section shall not be transferred to a subsequent owner upon the sale of a public food service establishment but shall expire automatically upon the sale of the establishment. The subsequent owner shall be required to reapply for a permit pursuant to this section if the subsequent owner wishes to continue to accommodate patrons' dogs.

509.242    Public lodging establishments
(1)    A public lodging establishment shall be classified as a hotel, motel, nontransient apartment, transient apartment, bed and breakfast inn, timeshare project, or vacation rental if the establishment satisfies the following criteria:
(a)    Hotel. —A hotel is any public lodging establishment containing sleeping room accommodations for 25 or more guests and providing the services generally provided by a hotel and recognized as a hotel in the community in which it is situated or by the industry.

509.511    Violation; Deceptive and Unfair Trade Practices Act-A violation of this act is a deceptive and unfair trade practice and constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act.

### Plaintiff Obtained Medical Treatment for Bed Bug Bites

98.  Upon her return to Chicago, Illinois, the Plaintiff obtained medical treatment for her bed bug bites and symptoms and the Jesse Brown Medical Center on April 30, 2025.

99. Therefore, Defendants' representations as set forth in Paragraph 44 of this Complaint are false and misleading and constitute deceptive acts or practices in violation of Illinois Fraud and Deception Act.

### COUNT I.

28

## BREACH OF CONTRACT BY DEFENDANTS
## WYNDHAM, SEA RESORTS AND LAQUINTA

100.  Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

101.  To state a claim for breach of the contract, a plaintiff must allege (1) the existence of an agreement between the Plaintiff and the defendant; (2) due performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages attributable to the breach.

102.  Defendants Wyndham, Sea Resorts and LaQuinta owed the Plaintiff the duties to maintain the hotel in a reasonably safe condition, and furthermore, Defendants owed a duty to take reasonable steps to ensure that the hotel could be used safely by guests such as Plaintiff.

103.  During her hotel stay, the Plaintiff was moved between two different guest rooms to bed bug bites and other complaints as stated below.

104.  An enforceable agreement existed between the Plaintiff to pay the amount charged for hotel services, $696.60, and Defendants American Forces Travel, Priceline.com LLC and Wyndham Hotels and Resorts, doing business as LaQuinta Inns and Suites to provide hotel services for one (1) person in one (1) room, from April 23-28, 2025, in Panama City Beach, Florida.

## Breach of Contract by Wyndham, Sea Resorts, and LaQuinta
## "Willful and wanton conduct,"

105.  Defendants, La Quinta Inn & Suites, La Quinta Holdings Inc., LQ Management LLC and Wyndham Hotels & Resorts, Inc., are referred to herein as the "Franchisor Defendants."

106. To prevail on a breach of contract claim, "a plaintiff must prove: (1) a valid contract existed [,] (2) a material breach of the contract [,] and (3) damages."

107. "To establish a material breach, the party alleged to have breached the contract must have failed to perform a duty that goes to the essence of the contract and is of such significance that it relieves the injured party from further performance of its contractual duties."

108. As part of the franchisor/franchisee relationship, Franchisor Defendants are each responsible for, among other things:

A. Creating and defining safety standards that franchisees are supposed to maintain;

B. Creating and defining operational standards;

C. Setting parameters and standards for employee wages;

D. Clearly communicating these standards to franchisees;

E. Creating training materials for franchisees and their employees;

F. Providing a substantial portion of the training to franchisees and their employees;

G. Regularly inspecting the franchisee's facilities and operations to ensure compliance with franchisor standards;

H. Enforcing the standards that the franchisees are required to maintain;

I. Terminating and replacing non-compliant franchisees; and

J. Exercising control over hotel bookings through online booking websites.

109. Because of this relationship, the franchisor Defendants had the right to control and in fact did control whether their franchisees took reasonable actions to prevent sex trafficking.

110. Because of this relationship, the franchisor Defendants had the right to control and in fact did control whether their franchisees took reasonable actions to prevent bed bugs, room sanitation, safety and comfort for hotel guests.

111. As Defendants, Wyndham, Sea Resorts control La Quinta. All franchisee/franchisor actions are tied to Defendant, Wyndham, Sea Resorts based on the contractual franchisee/franchisor relationship.

112. The Agreement between the Plaintiff and Wyndham, Sea Resorts and LaQuinta were entered into in Chicago, Illinois, through internet websites and Wyndham, Sea Resorts and LaQuinta Inn. The Plaintiff paid for the Hotel services in Chicago, Illinois.

113. Therefore, the Defendants Wyndham, Sea Resorts and LaQuinta are in breach of their duties to provide hotel services to the Plaintiff.

114. The breach of the Agreement was the direct and sole cause of the Plaintiff's not having hotel services as promised and required under the Agreement, Florida hotel regulations and industry standards.

115. After trying to resolve the problems with LaQuinta staff, and LaQuinta ignoring the problems and making no attempts to resolve the problems, the Plaintiff had to obtain hotel services elsewhere in Panama City Beach, Florida.

116. The Plaintiff obtained hotel services with Hampton Inns and Suites, located at Hampton Inn and Suites, located at 13505 Panama City Beach Parkway, Panama

City Beach, Florida 32407 for three (3) days. The hotel rate was $159.16/night versus 113.95/night at LaQuinta.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

### COUNT II.

### UNJUST ENRICHMENT BY DEFENDANTS WYNDHAM, SEA RESORTS, AND LAQUINTA

117.  Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

118.  Defendants Wyndham, Sea Resorts and LaQuinta breach of contract resulted in them being unjustly enriched by the Plaintiff's payment of $696.60, and not providing the services agreed to by the Defendants.

119.  A claim for unjust enrichment requires a showing that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

120.  Unjust enrichment applies when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled.

121.  It is against equity and good conscience to permit the defendants to retain what is sought to be recovered.

122.  As a result of the Defendant's breach of the agreement, the Plaintiff was not able to receive the services bargained for with the Defendants.  Due to the Defendants failure or refusal to provide hotel services, and the Plaintiff providing every opportunity to remedy the problem, the Plaintiff was forced to obtain hotel services at another hotel, Hampton Inn and Suites, 13505 Panama City Beach Pkwy, Panama City Beach, FL 32407.  (Exhibit 4, Hampton Inn itinerary and proof of payment for April 26-28, 2025).

123.  Plaintiff was forced to pay a higher room rate to obtain hotel services for three (3) days.  At LaQuinta the room rate per night was $113.95.  At the substituted hotel services at Hampton Inn was $159.16 per night.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT III.

## NEGLIGENCE BY WYNDHAM, SEA RESORTS AND LAQUINTA

124.  Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

125. (1) a duty requiring the defendant to conform to a certain standard of care; (2) the defendant's breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages.

33

126. However, 'a possessor of land is under an affirmative duty to use reasonable care to make the premises safe for use by invitees.'"

127. "The standard of reasonable care generally includes an obligation to discover and correct or warn of unreasonably dangerous conditions that the possessor of the premises should reasonably foresee might endanger an invitee." Id. "Generally, 'where reasonable people could differ as to whether the danger of some injury is foreseeable, the question of negligence is one of fact for a jury to decide.'" Id. at 529 (quoting Markowitz, 706 P.2d at 369–70). "To establish a proprietor's liability for injuries arising from a dangerous condition of the premises, an invitee must prove either that the dangerous condition was caused or permitted to develop by persons for whom the proprietor was responsible or that the proprietor had actual or constructive knowledge of its existence."

128. At all times relevant hereto, it was the duty of Wyndham, Sea Resorts and LaQuinta to exercise reasonable care under the circumstances to keep its premises reasonably safe for use by the Plaintiff and other hotel guests.

129. Defendants owed concurrent duties of care to Plaintiffs to provide a safe environment and to maintain the Resort in a reasonably safe condition so as to enable the Plaintiffs to safely enjoy their stay at the hotel.

130. Defendants owed Plaintiffs a duty to ensure that the area occupied by the Plaintiffs was free of bed bugs.

131. Defendants breached their duty of care by failing to exercise reasonable care in the maintenance, inspection, repair or warning of dangerous conditions existing

34

on the hotel property causing the Plaintiff to be bitten and suffer physical and mental injuries.

132. Defendants breached their duty of care owed to Plaintiff and were negligent by failing to warn Plaintiff of the dangerous and hazardous condition.

Among other things, Defendants breached their duty of care to Plaintiff, by:

a. Failing to inform the Plaintiff about the dangerous and hazardous condition that existed on the premises.

b. Failing to keep the premises free of dangerous spiders.

c. Failing to mark or otherwise block access to the areas where the unreasonably dangerous and hazardous condition existed.

d. Failing to fog the guest rooms before they were occupied by Plaintiffs. ie, failing to take proper care of Plaintiffs' luggage while they were being transferred from one guest room to another.

e. Failing to provide a single room to the Plaintiffs, such that the subject unreasonably dangerous and hazardous condition could have been avoided when Plaintiffs were being transferred between rooms.

f. Failing to inspect the hotel to find and eliminate dangerous spiders.

g. Failing to inspect furniture and other items in the room to ensure that dangerous spiders were not on these items.

h. Failing to employ proper exterminating policies and practices that would have eliminated dangerous bed bugs from the Resort,

133. As a result of Defendants' negligence, Plaintiff suffered physical and mental injuries.

35

134. There are several essential elements of a negligence claim against a premises owner: a duty to protect the plaintiff from the injury of which he complains; failure to perform that duty; the plaintiff's injury must proximately result from such failure; and proof of damages.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT IV.

## GROSS NEGLIGENCE BY WYNDHAM, SEA RESORTS AND LAQUINTA

135. Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

136. At all times relevant hereto, it was the duty of LaQuinta to exercise reasonable care under the circumstances to keep its premises reasonably safe for use by the Plaint and other hotel guests.

137. Wyndham, Sea Resorts and LaQuinta breached that duty when it, among other things, allowed an infestation of Cimex Lectularius (a bed bug known to carry disease, bite and suck blood from people while they sleep: to become established in room 325 and 225, learned of the infestation and still rented room 325 and 225 to the Plaintiff.

138.  Wyndham, Sea Resorts and LaQuinta's action against the Plaintiff were willful and wanton.

139.  As a direct and proximate result thereof, the Plaintiff suffered damages which include, but not limited to, the following:

A. The physical injury she sustained when she was severely bitten and became a food source, while she slept in 325 and 225 and the subsequent guest of room 325 along with his wife and children, and pet.

B. The psychological injury she sustained when she awoke and discovered Cimex Lectularius in their beds and learned she was severely bitten and became a food source while she slept, Cimex Lectularius.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

### COUNT V.

### PREMISES LIABILITY

140.  Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

141.  Hotels have a legal duty to maintain their premises in a safe and habitable condition for guests. This includes providing a room free from dangerous or unhealthy

conditions like pest infestations. Suing a hotel for bed bugs comes down to whether you can prove negligence.

142. There are several essential elements of a negligence claim against a premises owner: a duty to protect the plaintiff from the injury of which he complains; failure to perform that duty; the plaintiff's injury must proximately result from such failure; and proof of damages.

143. The Defendants are required to use reasonable care to warn of, safeguard against or remedy an unreasonably dangerous condition of which it had notice. Notice of the unreasonably dangerous condition is satisfied by any of the following: (a) The Defendants or its employees created the condition; (b) The Defendants or its employees actually knew of the condition in time to provide a remedy or warning; or (c) the condition existed for a sufficient length of time that The Defendants or its employees, in the exercise of reasonable care, should have known of it.

144. For a successful lawsuit, you must prove negligence on the part of the hotel. This means establishing that: The hotel knew or should have known about the bed bug infestation (duty of care). They failed to take reasonable steps to prevent or eradicate the infestation (breach of duty). This failure caused the guest to suffer harm (causation).

145. When it comes to proving that the Florida hotel where your accident occurred was responsible for your injury, there are four key elements that must be established to demonstrate the hotel's negligence: The existence of a duty of care; The hotel reached the duty of care; The breach resulted in the accident; The accident caused damages.

38

## Existence of a Duty of Care

146. A hotel assumes a duty of care the moment you book a hotel room. A duty of care is basically a relationship between parties where one party (the hotel) should reasonably be taking care of the other (the guest).

147. Thus, the hotel is responsible for making its premises reasonably safe for its guests.

148. In premises liability cases, the plaintiff must show the defendant had actual or constructive notice of the dangerous condition on its premises, the defendant owed a duty to protect the plaintiff from the dangerous condition, the defendant breached that duty, there was a causal connection between the defendant's breach and the plaintiff's fall, and the plaintiff suffered damages as a result.

149. "[A] business owner owes two 'separate and distinct' duties to business invitees: '1) to warn of concealed dangers which are or should be known to the owner and which are unknown to the invitee and cannot be discovered through the exercise of due care; and 2) to use ordinary care to maintain its premises in a reasonably safe condition.'"

## Hotel's Obligation to Maintain Premises

150. Hotels are required to take reasonable steps to exterminate bed bugs within the rental property.

151. Plaintiff allege that Defendants owed her a duty to ensure that the areas she occupied at the hotel were free of bed bugs.

152. Plaintiff allege that Defendants breached this duty of care by, among other things, failing to inform her of this dangerous condition, by failing to keep the premises free of bed bugs, and by failing to have an adequate pest control program.

## The Breach Resulted in the Accident

153. The Plaintiff suffered extensive injuries, physical and mental as a direct result of the Defendants' negligence. She incurred medial expense, in addition to the pain and suffering.

## The Negligence Caused Damages

154. There is a common law of duty of care along with statutory laws that the Florida hospitality industry must abide by. If the hotel's carelessness or mistakes result in the harm of visitors, patrons, or guests, they may also be held liable for negligence.

155. Generally, an innkeeper, under the common law doctrine of infra hospitium, is strictly liable for loss or damage to a guest's property unless the property is lost or destroyed by an act of God, public enemy, or by the fault of the guest, or from some irresistible force other than the act of God or from an inevitable.

156. Hotels generally have limited liability for guest property, but this is often tied to whether they have taken reasonable steps to ensure its safety and security. While the "innkeeper's liability" concept, historically holding innkeepers strictly liable, is largely modified by statute, hotels still have a duty of care to protect guests and their belongings.

157. The Defendants at fault for liability pursuant to:

1. The defendant was the property owner or occupier at the time of the injury. A business owner who merely leases the property from, say, a shopping mall,

40

can still bear premises liability. For the sake of simplicity, the term "owner" is used herein to include both owners and occupiers, such as lessees.

2.   The defendant's care and maintenance of the property were negligent (negligence means roughly "carelessness"). The defendant might have broken a safety law or regulation, but the victim can establish negligence 3.

3.   The victim suffered a tangible injury. If so, they might also claim damages for

4.   The defendant's negligence caused the victim's injury.

158.   Hotels are legally required to protect guests from foreseeable dangers. When they neglect this responsibility, they may be liable for injuries resulting from that negligence.

159.   The Defendants did not have monthly treatments for pests, management, employees, and housekeepers were not trained to spot and report any pest activity and there were numerous guest complaints about pests on LaQuinta internet reviews which were responded to by LaQuinta.  LaQuinta did not maintain a log of maintenance reports for several months leading up to Plaintiff's stay.

160.   As the operator of the Hotel, Defendants owed a duty to Plaintiff to maintain the premises so as to avoid the creation of conditions that pose an unreasonable risk to its guests.

161.   Defendant breached its duties, created an unreasonable risk, and was negligent in one or more of the following particulars:

a. Failing to properly treat past infestations of bed bugs and leaving bugs, larvae and eggs in place;

41

b. Failing to inspect Room 321 and other areas of the hotel for the presence of bed bugs;

c. Failing to promptly respond to Plaintiff's initial complaints about bug bites;

d. Failing to promptly offer Plaintiff another room.

162. It was reasonably foreseeable that Defendants' negligence would create unreasonably dangerous, unhealthy, and uninhabitable conditions in the Hotel and that Plaintiff would suffer harm as a result.

**WHEREFORE**, as a direct result of Defendants' negligence, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT VI.

## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT (ICFA) BY DEFENDANTS WYNDHAM, SEA RESORTS AND LAQUINTA

163. Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

164. At all relevant times, there was in full force and effect a statute commonly known as the Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act) (815 ILCS 505/2) which provides in pertinent part as follows:

(815 ILCS 505/2) (from Ch. 121 1/2, par. 262)

"Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception

42

fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act. (Source: P.A. 78-904.)"

Section 10a(c) of the Act provides that "a court may award reasonable attorney's fees and costs to the prevailing party."

165.  Defendants violated the Consumer Fraud Act when it placed the Plaintiff in a room known by it, through its employees/agents, to be infested with bed bugs.

166.  As a direct and proximate result thereof, the Plaintiff suffered damages which include, but are not limited to, the following:

A.  The physical injury she sustained when she became a food source, while they slept, for the other occupant of room 504, and

B.  The psychological injury they sustained when the Plaintiff learned they became a food source, while they slept, for the other occupant of room 504, and

C.  Attorney's fees sustained in prosecuting this action.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT VII.

### FRAUDULENT CONCEALMENT

167. Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

168. When the Defendants rented the Plaintiff room two different rooms, it made a false statement of material facts to her, namely that the room was clean, safe and habitable, when in fact, it was not.

169. The Defendants knew that such statement was false.

170. The Defendants made statements with intent to induce the Plaintiff to pay them money in exchange for the hotel accommodations.

171. The Plaintiff acted in justifiable reliance on the Defendants representations when she rented the hotel room accommodations from the Defendants.

172. The Plaintiff suffered significant physical injuries, psychological distress and economic loss as a result of her reliance on the truth of the Defendants' statements.

173. Plaintiff should be awarded punitive damages in an amount sufficient to punish the Defendants for their actions and to deter them from committing such acts in the future.

44

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT VIII.

### VICARIOUS LIABILITY AGAINST WYNDAHAM, SEA RESORTS AND LAQUINTA

174. Plaintiff hereby incorporates reference each of the allegations in the preceding paragraphs as if fully set forth herein.

175. Defendants are further liable for the acts and omissions of their franchisees, employees, subcontractors if any or contractual agents, of Wyndham, Sea Resorts and LaQuinta, and due to the Owners/Franchisor Defendant's, Wyndham, Sea Resorts and LaQuinta negligent failure to:

A. identify the proper operators to serve as franchisees or contractual agents;

B. train or supervisor their franchisees or contractual agents;

C. create and implement antitrafficking measures; and

D. train and monitor their franchisees or contractual agents' compliance with said measures.

176. To the extent that any Defendant is found not to be directly liable to Plaintiff, they are liable pursuant to all counts of this Complaint under one or more of the foregoing referenced doctrines:

45

A. Each Defendant found not to be directly liable to the Plaintiff is liable under the doctrine of aiding and abetting or a similar applicable state or federal doctrine, law, statute, or regulation.

B. Each Defendant gave substantial assistance, comfort or encouragement to Tom Roe to perpetrate his sex trafficking scheme and violence against the Plaintiff;

C. Each Defendant, directly or through one or more of its employees or agents, actively took part in Plaintiff's trafficking, or furthered it by cooperating with Tom Roe, or ratified and adopted their actions so that the joint ventures could make money, avoid detection, and continue as a business; and

D. Each Defendant's conduct was a substantial factor in causing harm to Plaintiff and perpetuating her trafficking because without the hotels or motels, permitting the sex trafficking or forced prostitution would not have occurred; and

E. Each Defendant found not to be directly liable to the Plaintiff is liable under the doctrine of respondeat superior or a similar applicable state or federal doctrine, law, statute, or regulation.

177. Plaintiff claims defendant, Wyndham, assert sufficient control over the franchisee's business, noting management training mandated by the defendants that requires managers to assert control over working conditions. Additionally, the franchisors require franchisees to use particular hardware, mandating particular training and standards of operation and workers' appearance, and requiring franchisees to conform to all laws and regulations applicable to hotels. Embassy Suites requires use by franchisees of proprietary property software that addresses management programs,

46

a reservation program, a revenue management program, a reservation system, quality control, and more.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00 and costs, court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just and proper and equitable.

## COUNT IX.

### PUNITIVE DAMAGES AGAINST
### WYNDHAM, SEA RESORTS AND LAQUINTA

178. Plaintiff hereby incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

179. The court compared the defendant's conduct to "deliberately spitting in another person's face," an outrageous act that causes only slight compensable harm, but considerable dignitary harm.

180. Due to the acts or omissions of the Defendants, Wyndham, Sea Resorts and LaQuinta, either separately or together, Plaintiff is entitled to an award for punitive damages to deter Defendants from similar wrongful conduct in the future.

181. Defendants' conduct in allowing, either knowingly or recklessly, Plaintiff to incur violations, monetary damages, and suffering, both physically and emotionally was deliberate and outrageous and a blatant violation as set forth above.

182. Each Defendant's conduct, either separately or together, was so egregious and outrageous that further discouragement is required because the harm suffered by

47

Plaintiff was a deliberate act or omission that was foreseeable due to the gross, reckless, and careless actions of the Defendants.

183.  Plaintiff's claims for punitive damages are timely under the doctrines of continuing tort tolling, disability, equitable tolling, estoppel, and all applicable state or federal laws, statutes, or regulations.

184.  Moreover, each Defendant's knowingly or recklessly malicious conduct caused Plaintiff to suffer substantial physical and psychological injuries as a result.

**WHEREFORE**, Plaintiff, demands judgment from Defendants Wyndham, Sea Resorts and LaQuinta for compensatory damages, consequential damages, prejudgment interest, post judgment interest, punitive damages, applicable statutory damages, incidental damages in excess of $200,000.00, costs, and court costs, including reasonable attorneys' fees, and applicable interest, and such other relief as the Court deems just, proper and equitable.

## DEMAND FOR JURY TRIAL

185.  Plaintiff hereby demands trial by jury on all claims and issues so triable.

Dated:  January 2, 2026

Submitted by,

/s/Vanessa Smith
VANESSA SMITH, Plaintiff
1811 Hanover Lane
Flossmoor, IL 60422
Tel:  773-370-1187
Email:  gc.3@yahoo.com

## VERIFICATION BY CERTIFICATION

48

Under penalty as provided by law pursuant to 735 ILCS 5/1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

Date: January 2, 2026                                   Signature: /s/VANESSA SMITH

## CERTIFICATE OF SERVICE

I, Vanessa Smith, Plaintiff, hereby certify that on January 2, 2026, a true and correct copy of the foregoing was served on the party set forth below by U.S. Mail, Certified first class to the address below.

Wyndham Hotels and Resorts Inc.
c/o Registered Agent
Corporation Creations Network, Inc.
1320 Tower Road
Schaumburg, IL 60173

By the Sea Resorts, LLC
c/o Registered Agent
Michael Burke, Esq.
16215 Panama City Beach Pkwy
Panama City Beach, FL 32414

LaQuinta Inn and Suites, Inc.
c/o Registered Agent
Corporation Creations Network, Inc.
1320 Tower Road
Schaumburg, IL 60173

/s/Vanessa Smith
Vanessa Smith, Plaintiff
1811 Hanover Lane
Flossmoor, IL 60422
Tel: 773-386-0148
Email: homewardlight@gmail.com

49

EXHIBITS

LA QUINTA
BY WYNDHAM

La Quinta Inn & Suites by Wyndham PCB Pier Park area. 17710 W. Panama CTY, Panama City Beach, FL  Tel: 850-249-1112

**GUEST INFORMATION**

Smith, Vanessa

**WYNDHAM REWARDS INFORMATION**

**RESERVATION INFORMATION**

Confirmation No: 41135*268

Daily Rate:

Room Type: 1 King Bed, Non-Smoking

Room #:

Guest Initial: _VM_

Arrival Date: 04-23-25
Departure Date: 04-28-25
Number of Nights: 5
Number of Guests: 2 0

Rate Code: SS1
Group:
Company:

Fixed Charges:

**SETTLEMENT INFORMATION**

Payment Method:  MasterCard: XXXXXXXXXXX5181  XXXX

**PLEASE NOTE: Check out time is 11:00 AM.**

If any of the above information is incorrect or incomplete, please use the section below.

Name: _VANESSA SMITH_    Telephone: _412 983 - 0714_

Address: _1811 Hanover Lane_    City: _FLOSSMOOR_

State/Prov: _ILLINOIS_    Postal Code: _60422_    Country: _USA_

Email Address: _beemeeallday @ gmail . com_

License Plate #: _none_    Make: _/_    Model: _—_

I accept personal liability for this bill if the listed individual, company, or association fails to pay any or all charges for occupants of the specified room. I am also responsible for any loss or damage to the premises or contents. Use of facilities is at the user's own risk, and La Quinta Pier Park is not liable for vehicle damage or personal injuries on the property. I authorize La Quinta Pier Park to charge my credit card for room charges, incidentals, and fees. A hold of $50 per night (up to $250 for 5 nights) will be placed on my card for incidentals, with refunds issued for unused amounts after checkout if no outstanding charges remain. _VM_ Initial

• Smoking policy: La Quinta Pier Park is a non-smoking property. Smoking is prohibited in all guest rooms and in public spaces that are not designated for smoking. A cleaning fee of $250 will be applied if this policy is violated. _VM_ Initial

• Pet policy: Your furry friends are welcome at La Quinta Pier Park. A non-refundable fee of $25 per pet/ per night (maximum 3 nights) is charged at check-in. The property allows a maximum of 2 dogs not exceeding 50 lbs each. _VM_ Initial

• Early Departure policy: If a guest checks out earlier than their scheduled departure date, an early departure fee equal to one night's room rate plus tax may be charged.

• Housekeeping Policy: Our housekeeping team provides a full-service cleaning on the 3rd day of your stay, which includes linen replacement, bathroom cleaning, trash removal, and restocking of supplies. Additional services are available upon request at the front desk. _VM_ Initial

**Signature:** _[signature]_

Please contact the Hotel Manager about any issues with your stay. Wyndham Hotels and Resorts or affiliates may contact you about goods and services unless you call 866-940-4299 or write Wyndham Worldwide Hotels, Inc., 22 Sylvan Way, Parsippany, NJ 07054 to opt out. View our Wyndham Hotels and Resorts website for our policy.

Re: Quality Issues PTR 78903915516 complaint for full refund

Apr 27, 2025 at 8:03:02 AM

SubmitDocuments@service.priceline.com, Sender H

I am requesting a full refund due to

Bed bugs
Improper ac/heat unit
Severe Humidity problem damp bedding
The bed linen was not changed from the previous guest an item was left in the bed
Very slow draining tub
Employee named Toni refusal to assist with my complaint. She refused to even say her name. I heard her mention the words "again" to another employee. I had to get her name from somebody else
I have attached photos
There was signs that I was in a room that had a pet such as dog hair and stains
I'm a non pet person

I refuse to pay and stay at such a room or place with bed bugs.

I did book another hotel room for Sat and sun night with price line for Hampton Inns.

As a result of the bed bugs I had to contain my clothing in a plastic bag. I am experiencing bad pain in my chest arms neck shoulders and back, and face, welps, swelling and severe itching.



I am requesting a full refund of the La Quinta reservation.

The cost of my replacement 2 nights was $400.00.

Vanessa ████





6:51 

2,272 Verified Reviews

# 2,272 Verified Reviews ✕



### "I wouldnt recommend for anyone to stay there. Its filthy."

Apr 2025

They were kind upon arrival and allowed us to swim when we got there waiting on our room.

Once our room (309) was ready and we got up there we found a dirty room that had stuff spilt in the floor and on the dresser. The floors weren't swept or mopped. There was hair EVERYWHERE! I went back down and the cleaning lady came back up with me (in the elevator she mentioned this was their worst room! I asked for another and she said well, we cleaned it) she swept and wiped some of the stuff up from the floor and off the dresser. (The sticky stuff in front of the dresser was left so I cleaned it myself.) the shower curtain rod was falling out of the wall so maintenance had to come screw it back up. Also, Our phone to the front desk didn't work so we had to walk down for any assistance we needed (Not a huge deal). None of the vending machines worked. The ice machine our floor was also broken so you had to go to the main floor for ice. The bathtub

6:51

# 2,272 Verified Reviews                    X

down for any assistance we needed (Not a huge deal). None of the vending machines worked. The ice machine on our floor was also broken so you had to go to the main floor for ice. The bathtub also took forever to drain. I tried looking over all of that and we stayed the first night. We enjoyed our first day in PCB and got back to settle in for the evening. When I sat on the bed to do school work I was leaning back and noticed something move.... It was a BEDBUG! Also to add, they told us due to us finding a bed bug they had to cancel the remainder of our stay. (Not that we would have wanted to stay there) but I had two kids with me and they put us out at 9:45pm. They also didnt refund our money for the stay until 3 days later and our security deposit still hasnt been refunded. Also to add, I did call and report that the hotel had bedbugs and I had someone call me with an accent I could barely understand (said they were a florida inspector) and from what I understood they said they didn't find anything The picture shows what we found...

Family with Young Children

**Rebecca**

6:52 

## 2,272 Verified Reviews ✕

 **money, this place doesnt seem to want to accommodate guests with any hospitality or comforts."** Apr 2025

I hate to leave a negative review for any establishment but I really have nothing good to say about the hotel. Most likely would have never bothered to even share that fact but the front desk staff were the rudest people I have ever dealt with. Its beyond the pale when youre nicer to the staff than they are with you. We greeted them with Good morning, how are you? and we truly got nothing back except yes? If they dont want to be there, please dont take it out on the guests. Besides that major issue, our tub wouldnt drain, the water didnt get hot, there are no extra blankets, have to ask for towels downstairs every single day, no tissues or blow dryer in room (had to ask for that) AND no pillowcases. Big yikes, had to ask for those as well. Will never stay here again.

Phillip



 **"Great vacation"** Apr 2025

americanforcestravel.com

Our apologies, Wyndham cannot step into a smoking charge from a property. If your offices require more information on this matter, please contact me directly at *********************************

*******

Liaison, Customer Care
***********************************
Office: ************
**Initial Complaint**
Date:05/24/2025

Type:Product Issues

Status:AnsweredMore info

Date - 05/23/2025 Amount paid - $125.83 We arrived at the hotel and while checking in I saw a bug that looked like a ***** crawling around the fridge next to the check-in counter, we were given room number 208, and in the room, I found a dead *****, food behind the tv, (a full uneaten biscuit) and used paper plates and a lot of dirt under the AC/heating unit. After some more inspection, still-alive baby roaches were found under the bed closest to the window and we left immediately. And asked for a refund. We talked to a manager last night named Z who said a refund would be issued once we spoke with **********. I talked to them today and they said they were told no manager was available so they couldnt issue the refund without the manager's approval so they would reach out again later. Well, I called the hotel about two hours after talking with ********** and was told the manager had just left for the day and wouldnt be back until Tuesday, the person I was speaking with was rude and didnt seem to care much about the issue and hung up the phone on me without even getting any information about contacting me after I said I wanted to speak with the manager as soon as possible. So I called the Wyndham customer care number and that wasnt much help either. The person I spoke with was rude as well and told me there was nothing he could do. I feel like Im getting the runaround. And no one from ******* seems to care. All I want is a refund issued back to my account immediately, which I was told would be issued last night. This hotel should be closed immediately. Ill be contacting the local townships health department about this issue as well.

**Business Response**
Date: 05/26/2025
BBB Case #: 23374311
Hotel Site #: 07504
Customer Care Case #: ********
Dear Contact:
Thank you for notifying our office of the concern filed by ****** ****** at the La Quinta property in *****, **. To assist in reaching a resolution, Ive informed the

propertys general manager of the situation.The general manager will contact the guest on or before May 27th. As a company, were committed to delivering a great experience with every stay with us.

Please note that our email address has changed.If for some reason this concern is not resolved, please contact me directly at ********************* and I will personally help address the guest's needs.
*******

Liaison,Customer Care
**********************************

Recommended Reviews

Your trust is our priority, so businesses can't pay to alter or remove their reviews. Learn more about reviews.

Username

Location

000

Choose a star rating on a scale of 1 to 5

Filter by rating

Search reviews

Search reviews

Vanessa S.

Jacksonville, FL

084

Apr 26, 2025

Absolutely Not! Nonworking ac/heating unit; thermostat problems, high humidity bedding feels damp, yes bed bugs, bed bugs, not Changing bed linen after each room, specifically rm 325, slow draining tub, nasty unprofessional worker named Toni, not correcting problems that have been complained about on Yelp current reviews. Don't spend a dime there! Negative Zero stars.

6:09  



If I could give negative stars I would. After paying $630 for two nights we get into our "free upgraded" king suite because our two bed... read more

   

 Helpful 0     Thanks 0     Love this 0     Oh no 0

 **clifford p.**

📷 1   📝 37   📷 3

7 years ago

Could not stay in the room more than 15 minutes. Eyes immediately started itching. There was a serious humidity issue. I think from the... read more

 Helpful 0     Thanks 0     Love this 0     Oh no 0

 **Jessica D.**

📷 0   📝 1   📷 0

6 years ago